Right, our third and final case to be heard this morning is Miracle v. Hush, number 253032. We'll begin with Mr. Carswell. Thank you. May it please the Court, in 2018, the Kansas Supreme Court held that the Kansas legislature's elimination of tenure for K-12 teachers did not violate due process. In light of that precedent, the Kansas Board of Regents, during the COVID pandemic, took similar action and temporarily suspended tenure protections for public university professors. Yet the district court here, despite Scribner and the cases on which it relied, held that not only did plaintiffs allege a due process violation, but that somehow that violation was clearly established. That decision was wrong and should be reversed, with qualified immunity being granted to defendants on counts one through three of plaintiff's complaint, which are all based on the existence of a property interest and continued employment. Furthermore, qualified immunity should be granted to all defendants except Hush on the remaining plaintiff's claims, because plaintiff's complaint fails to allege defendants' personal participation in those asserted violations. On the due process claims, the district court attempted to distinguish Scribner on two grounds. First, the district court said, well, Scribner involved legislative action by the Kansas legislature. Here, this was the Kansas Board of Regents, which is sort of an executive branch agency, so maybe it's a little As the U.S. Supreme Court recognized at night, the executive branch takes action all the time that affects people's due process, or excuse me, property interest rights. The question is whether the action affects just a few individuals on individual grounds, or whether it's a broader application. And here, the Kansas Board of Regents' approval of the workforce management plan affected the property interest of all tenured professors throughout the state university system, even if you're just looking at the decision-making framework that was all faculty at Emporia State University. And so, the Board of Regents was not required to hold individualized hearings in order to adopt these policies. The policies themselves eliminated whatever property interest plaintiffs might have otherwise had, and therefore, at the time of their terminations, they no longer had those property interests. Second, the district court- Can I just ask you, though, if the policy, the workplace management policy, had a broad effect, if it affected a lot of tenured faculty members across the system, then why didn't the Board of Regents need to comply with the Filing Act in taking that action? Well, for, I think there are two issues there. First of all, under Kansas state law, the Rules and Regulations Filing Act says it doesn't apply to the internal personnel policies of an agency. And so, this involved, just for the same reason that plaintiffs' tenure policies originally were not adopted as regulations, if they weren't adopted as regulations to begin with, it's not clear why the Board of Regents would need to go through the regulatory process to revoke those. Secondly, even if, assuming there were some violations of Kansas state law, that itself doesn't violate the federal due process. Well, let me just back up when you reference the internal policy of the agency. Isn't the agency the Board of Regents? Well, Kansas law is a little complicated here because the Constitution creates the Board of Regents as the agency that oversees state universities, and then there are the state universities themselves. But I think, as I would interpret the Rules and Regulations Filing Act, the purpose here is basically internal personnel policies about who cannot be fired, and the universities are state agencies. Those are not subject to the Rules and Regulations. So is the Board of Regents. I mean, they're employees of the Board of Regents. And I just think this seems in tension with what you started out with, which was to say, oh, this was a legislative action. It affected a lot of people. It doesn't sound like a mere internal personnel decision. I mean, how do you square those two positions? Well, it affected temporarily the tenure rights of all statewide university faculties. That seems like a pretty broad impact. Precisely, and that's why individualized hearings were not required, why the policymaking process provided all the rights. I'm not sure I got my question across then. It seems like there's some tension between saying, oh, this is a legislative act that affected a broad category of people, on the one hand, and then you also say, oh, but they didn't have to comply with the Filing Act because this just concerned an internal personnel matter. How do you square those two things? Well, I mean, it's the same as if an agency might have a lot of employees if a policy applies across the board. If it's their internal personnel policies, the Rules and Regulations Act doesn't apply to them. What if it was a policy that applied to everybody in state government? Is that internal? I mean, if there were some agency that oversaw that, yes, and it could be. I mean, this is an interpretation of Kansas state law. Ultimately, I don't even think you need to go there because assuming even Kansas state law somehow was violated, that itself is not a federal constitutional violation. Well, if it was violated, though, let's assume for the sake of discussion it is, and I know you don't think it was, but if it was violated, why wouldn't that invalidate the action? Well, because that's a state law claim, whereas here they're bringing a federal due process claim. So the question is... But if the action was invalid, then they'd still have the property interest, the pre-existing property interest. It's not invalid as a matter of federal law. I didn't say it was. Is it invalid as a matter of state law? No, we don't believe it was. Why not? What authority do you have for that? Well, just the statutory language. How about the Taylor case? The Taylor case, that didn't involve internal policies. That had to do with recipients of government funding, the public, not internal within the agency. That had to do with members of the public. So we're back to your internal policy argument. Precisely. These are government employees. Obviously, the Board of Regents and the state university were one combined agency. I don't think there'd be any question. I mean, the only issue as well, because the Board of Regents oversees Emporia State University, does that somehow make it different? I don't think it does. I mean, under the Kansas Constitution, the Board of Regents is responsible for overseeing state universities. And so under the Rules and Regulations Filing Act, this is still a regulation that affects personnel policies and not the public. That addresses the district court's second point, which is the notice. For those two reasons, there is no basis for distinguishing Scripner in the cases on which it relies. Plaintiffs' due process rights, excuse me, property rights, were validly extinguished by the adoption of the Workforce Management Plan and the decision-making framework. So at the time of their terminations, they no longer had those property rights. And so their due process rights were not violated. On the second issue here, plaintiffs' remaining claims, those all relate. Let me just, before you go there, I think you started out saying the district court also said something about clearly established law. But did it really address clearly established law? I mean, the district court said there are precedents for property rights and cited some cases on notice, but no, we don't believe that the district court sufficiently addressed that. We don't think there is clearly established law, and that's why you should reverse, among other reasons. But was that a basis for the district court's actions? That was the question under qualified immunity. So yes, that was, the district court denied qualified immunity by apparently determining that there was clearly established law. Turning to the second issue, plaintiffs' remaining claims all relate to the issue of which plaintiffs or which professors would be terminated and which wouldn't. They're equal protection claims. We were terminated, these other people weren't. The freedom of association claims are we were terminated because of our associations. Then they also have a liberty interest claim, which is about what was said about them in the process of their terminations. Then conspiracy claims piggybacking on all that. The Board of Regents defendants had nothing to do with any of that. They established the policies, but there's no allegation that they were involved in the decision about who to terminate and who not to terminate or what was said about them in the process. So they should receive qualified immunity on all these remaining claims. Defendant Brent Thomas, who is the dean of the college and the provost, the only allegations against him in the complaint are that he attended a meeting on the workforce management plan and testified in front of the Board of Regents about the workforce management plan. Again, there's no allegation that he was somehow responsible for determining which plaintiffs would be terminated or what was said about them. So the only remaining defendants then are the attorneys, Kevin Johnson and Stephen Leavitt, who all they did were, according to the complaint, was serve as legal representatives for Emporia State in this employment dispute. Again, there's no allegation that they had, as attorneys, responsibility for determining who would be fired. So they should be entitled to qualified immunity on the equal protection and freedom of association claims. The district counsel didn't, didn't they work with President Hush in coming up with the termination letters? I mean, weren't they actively involved in the steps that led to the terminations? So two points there. First of all, talking about equal protection and freedom of association claims. Yes, you're right. They were, according to the allegations, involved in writing those letters. But it's, there's no allegation that they made the decision rather than they were just basically working for the ESU president who made those determinations. I was just, I was, I was intrigued by your argument. It seemed, it seemed to me like you're making an argument that because they were functioning as university counsel, that that should, that should take them out of the complaint. Is that, is that the point you're making? Yes, there's no, certainly no qualified, excuse me, clearly established law establishing that just merely. No, that's, let's not get to clearly established. Let's get to whether they could be maintained as defendants on, let's say, the first part of qualified immunity. Is there something about the fact that they were functioning as lawyers that, that, that, that they should be dismissed? Yes, because they were not the ones who actually made the decisions that led to plans being terminated. They were merely serving as counsel. Well, I understand the argument. I didn't see, was there any authority to back up your argument that they, that they should be dismissed? We cited some cases. There's not a lot of authority, just because I think people tend not to sue the attorneys over decisions that the employers make. But we cited the Yogers case from the Seventh Circuit, the case from the Southern District of New York, where they, the courts have said just an attorney's legal representation in and of itself does not violate the Constitution. You need to show something more. So here they would need to show, or at least allege at this point, we're at the bidding stage, we need to allege that these attorneys were somehow responsible for the decision to, for the termination decisions, or playing some role into that, affected that, rather than just serving as basically the agents of their employer. You don't hold the, there's no vicarious liability under 1983, so you don't hold the agents responsible for the actions of their principal. In regard to the liberty interest claim, this court has said that's violated by making a statement, and there's a lot of other prongs to that too, but here they were not the ones who actually made the statement. It was President Hush. And there we do cite the Supreme Court's case, just as a rough analogy, in Janus, where under the securities laws, the U.S. Supreme Court said, drafting statement does not equate to making a statement. So, especially once you get to qualified immunity, at the clearly established prong of that, there's no clearly established law that would have alerted them that just by serving as lawyers, it would be violating the Constitution. So they should be granted qualified immunity. Give me that Supreme Court case again you talked about. That one was Janus. I didn't write the full name, but it's cited in our brief about making a statement. Okay, thank you. Sure. I'd like to reserve the remaining time for rebuttal. Thank you, counsel. Thank you. Mr. Gragson. Good morning, your honors. Jay Philip Gragson, appearing on behalf of Applease, Immanuel Miracle, et al. Your honors, counsel, as a result of a concerted effort by members of the Kansas Board of Regents, officials at the University of Emporia State, and other unknown state actors, our clients, the professors in this case, their tenure rights as a property right were discontinued without appropriate due process in violation of the 14th Amendment. The professors in this case had a clearly established property right in tenure and should have been granted a notice sufficient to tell them why they were being terminated and a meaningful opportunity to be heard. In the course of infringing upon our client's property right, the defendants also infringed upon their liberty interest in their good name and ability to earn a living in the manner in which they terminated them. Now, this constitutional violation occurred over three steps, and the first step was the adoption of the workforce management policy by KBOR on January 20, 2021. The second step was the approval of ESU's framework by KBOR in September of 2022. The third and final step in this process was the termination of the professors the very next day that after KBOR had approved ESU's framework. Now, as of January 20, 2021, the day that KBOR passed the WPM, it was clearly established law that our clients had a property right in tenure. The case law is clear. We cited Tomkovich and several other Supreme Court cases for that proposition. Now, the term of tenure that each of the ESU professors had earned indicated they had a expectation of continued employment except for just cause or in the case of a bona fide financial exigency. Also, as of January 20, tenure as a clearly established property right, they were entitled to appropriate substantive and procedural due process. At a minimum, the clearly established law required a pre-termination notice of the reasons for termination and an opportunity to be heard as well as post-termination due process. Now, on January 20, when KBOR approved the workforce management policy, it's important to note that they had an agenda. We don't know when they posted it, but if they at all, there was absolutely nothing on that agenda telling anybody that they were even considering suspending tenure. So, there was no formal notice or any kind of opportunity to be heard prior to KBOR passing that policy. Now, when they passed that policy, it provided a couple of Number one, it said essentially that tenured faculty members could be suspended, dismissed, or terminated irrespective of any other policy. It also provided a, quote, appeal process to the Kansas Office of Administrative Hearings. However, it established the burden on the employee that, hey, we have a burden of showing why you shouldn't have got fired without any discovery, without the ability to call witnesses, or to cross-examine witnesses. But here's a significant point that it provided for. Unlike the legislature and Scribner, what KBOR said was, here's our policy. The state is arguing, therefore, it applied to everybody. Well, actually, they had a proviso that said nobody can take any action under this policy until they come to KBOR and we give you authority to do that. So, it wasn't self-executing. It wasn't like anything having to do with Scribner, where the legislature said, hey, we're doing away with due process hearings if you happen to get fired and you work as a teacher in K through 12. Here, KBOR said, you institutions, if you're going to use this, you have to come back to us and we'll approve it, which ultimately is step two in this process. Now, on September 14, 2022, ESU went to the KBOR meeting through President Hush and Mr. Thomas, and they presented their workforce policy. Now, in substance, that policy was very almost verbatim as to what the KBOR workforce management policy was. Now, it's interesting to hear the arguments of the broad application of this policy, because here's the reality. At that hearing, President Hush said that this policy would only impact about 7% of their employees. He also said, despite the discussion about all the financial issues, he also said, made it clear it's in the policy. This is no financial exigency. Nevertheless, KBOR approved that policy, knowing it applied to a very limited number of people. And what also KBOR did when they approved the framework, if you read the framework, KBOR is authorizing ESU to only be able to fire for the reasons outlined in the framework. The legislation in Scribner, this is way beyond anything the legislature did. This is adjudicative in nature. It says, here's the criteria. If you're going to implement it and go terminate folks, here's how you're going to do it. So, to get back to Scribner and further delineations, it's important to note that the, quote, terms of tenure, if you will, in Scribner included, as the court noted, KSA 75-2259, which provided nothing in this act shall be construed to create any right or to authorize the creation of any right which is not subject to amendment or nullification by act of the legislature. I'm calling that a term of tenure under the K-12 due process scheme. Now, there's nothing similar that the defendants can point to that is in the tenure policy of ESU or KBOR. In other words, we didn't have, our professors didn't have this term that they could take it away willy-nilly whenever they wanted to. That is a significant distinguishing term and makes Scribner have no application whatsoever in this case. Now, again, even if the court were to undertake the Scribner analysis, at the end of the day, this policy only impacted 30 professors, not the 30-some-odd thousand K-12 teachers that there were in Kansas. 30 professors. Understand that that suspension of tenure policy had a sunset clause. It's gone, and so when they say it applied to everybody, well, everybody but the 30 professors who were fired still have tenure because that's the policy that's applicable after December of 2022, unlike, again, what the Kansas legislature did in Scribner. For everybody who was a teacher, if you get fired moving forward, you are not going to have a due process hearing, and the legislature was done. Now, we believe that we've established and alleged, clearly established property rights in tenure and liberty interest. We've also established that there was no process prior to the removal of their property right claim in tenure. None. There was none at the stage at which KBOR passed its initial policy. There was no opportunity to be heard when KBOR approved the framework submitted by ESU, and the hearing, well, let me strike that. First of all, they got no pre-termination notice whatsoever. And I take it their termination did not, there was nothing that accompanied that that said here individually for each of you is the reasons you're being terminated because of inadequate performance or something like that. Yeah, good question, Judge. Here's what they did. They had nine sort of criteria as reasons that anyone, the tenure professor, could be terminated under the policy. Those covered the waterfront, pretty much. Right, but they were all generic, right? But when it got time to give the letters to the individual professors, it didn't specify, for example, okay, under performance, here's what you did. It just said, hey, it could be one of these nine things. And let's go to hearing. You don't get to ask us which one it is. You don't get us to ask us documents, whether it supports this notion that this was financially motivated. You don't get to call witnesses. You don't get to cross-examine. I'm sorry. You don't get, I mean, I take it the hearing wouldn't have provided for calling which clause and what deficiency is being alleged. Why do you think that that would not have been, if they had tried to ask that question, it wouldn't have been accepted and responded to? There was no mechanism for calling witnesses at the hearing. I'm not talking about calling witnesses. What if they were just asking the question of the board? Tell us of these wide-ranging possibilities, which one we were deficient in and why. Couldn't they have asked that question? Well, in theory, I suppose, but let's put it in context, Your Honor. If you're talking about the point at which KBOR was approving the framework, there was no invitation to anybody to come in and ask questions. No, I understand that. The framework was not, there was no process involved there, I understand it. But the implication in the, when the framework was being implemented against these professors, wasn't there an opportunity for them to say, tell us, I know the notice of termination was very broad. We just want you to be more specific. Couldn't they have, wasn't there a chance in a hearing to ask for clarification of what, why they were being fired? No, Your Honor. No. KBOR authorized the framework September 14th. The next day, September 15th, our clients were called to an off-campus location, handed their termination letters and said, this is what the process is you're getting. You have to do this appeal. You responded. When you go to the hearing, all you can do is give oral argument. That's what they were presented with. That's the extent of it. Well, okay. And you're saying that they could not there, I think it's clear they couldn't have called witnesses or presented evidence. And that may be all the further we need to go. That may be itself enough of a problem, but you're saying that they wouldn't, they didn't even have the opportunity to say, clarify and be more specific about why each one of us is individually being fired. That question could not have been asked. Your Honor, I don't know that it's, it's specifically in the record, but I do know that. I only want to know, I only want to know what's in the record. Okay. The answer is no, Your Honor. They were not afforded an opportunity to be able to ask those questions. Well, they weren't afforded or the record doesn't say whether they could have done it or not. Well, Your Honor, I understand that at the hearing, they tried to ask, ask questions, but that was just to the council that was arguing for ESU. There was no sworn witness. It wasn't an evidentiary thing. And at that point, that's a post-termination hearing without any discovery at all. Keep in mind that these professors had tenure rights before all this process happened. And as we sit here today, they still don't know why they were fired. They still don't know why they were fired. And the response. I think, I think that's as far as it apparently isn't going to be useful to pursue it any further. We'll figure, I'll figure it out in looking further through the record. Thank you. Okay. Can I just ask you if, if we disagree with you on the Scribner argument and think that this was more legislative than administrative in adopting the workforce management policy, is that where your argument about the filing act comes in? That is, I didn't hear you say anything about that this morning, but your brief argues that, that the KBOR didn't follow the filing act. And for that reason, the workforce management policy, even if it were legislative, did not eliminate your client's property interest. Am I understanding your argument correctly or used or not? Yes, your honor. And in part, the regulatory part of our argument was in response to the position that, that KBOR were taking. We don't think it was legislative at all as I delineated the differences. And to the extent they're claiming, oh, well, it had broad application. And then they turn around and say, well, no, it's really just a personnel. We're saying, well, no, if you're saying it is a broad application that it did need to be regularly submitted to the filing act. So yes, your honor, if the court decides we think this is more legislative, then we agree. The court in Scribner walks through the due process that was sort of built into the legislative process. We didn't even get that here. We did not even get that here. State cannot pass laws that violates constitution. For, I see my time's out. After the end of the questions, we request that the appeal be denied in the manner remanded for further proceedings. But thank you for your time. Thank you, counsel. Mr. Carswell, rebuttal. Just a few quick points. First of all, in terms of the number of people who were affected, I claim that this was limited. Again, the workforce management plan affected every state faculty member with tenure and the decision-making framework, every ESU professor. The fact that only a certain number were ultimately fired doesn't change that analysis. But even if you're looking at the third year, I think it was 33, actually, there were professors who were fired. If you look at the Seventh Circuit's decision in the Dibble case that we cited in our brief, that only affected a total of 29. Those were arbiters, and only nine of those ultimately lost their jobs. And yet the Seventh Circuit said, this is still a broad class of people, not a small number who were entitled to individualized hearings. So this is legislative under well-established precedent. Certainly no clearly established law saying the other words. In terms of it being temporary, we cited a case from the Fifth Circuit, McMurtry v. Holliday, where that was a temporary suspension of, those were merit service protection type similar issue. And the Fifth Circuit said that that's still a valid underdue process. And in fact, that case was cited by the Kansas Supreme Court in Scribner. That's part of this well-established precedent that this legislative process, when a number of people are affected like this, that was the entire department of the state government, that the process, the policymaking process provides all the process that's due. In terms of Judge Ebel's question, he was getting quite a bit into the particular procedures for the OAH hearings. So the due process has obviously two components. One, you have a property right, and then two, what protections or what procedures are required. Here, the argument below is focused exclusively on the first part, that they don't have a property right. The workforce management plan and the decision-making framework eliminated that property right. So there was no briefing on whether the procedures, the OAH hearings were sufficient under due process. Because by that time, they didn't have a property right by the time of their terminations. And so there was no due process violation. Was there any further questions? I urge you to reverse the district court. Counsel, what is the status of the plaintiff's challenges in the Kansas state courts? Are there still pending matters? So ESU, the OAH hearings, the office of administrative hearings, cases that it lost, it appealed those up to the district court, and now they're before the Kansas court of appeals. That's been briefed. They've said they're going to have an argument. Argument has not been said here. Is there any further questions? You're not arguing that the federal court should hold off in light of the pending state proceedings? That was an argument made in the district court. We're not arguing that now, in part because those cases are entirely to do with whether ESU complied with the decision-making framework. They don't raise federal due process claims. Those aren't an issue there. Could they raise due process claims in the state proceeding? They could not have before the office of administrative hearings. Once they took it up to state district court, I think they potentially could have. Thank you. Thank you, counsel. Thanks to both of you for the arguments this morning. Thank you for doing a Zoom argument. I know that wasn't what you were expecting, but neither were we. We will consider the case submitted and counselor excused. This court will stand in recess until tomorrow morning, I believe at nine o'clock. Thank you. Thank you, your honor.